## COMMONWEALTH v. SAMUEL K. EICHELBERGER.

ERROR TO THE COURT OF QUARTER SESSIONS OF LEHIGH
COUNTY.

Argued January 31, 1888—Decided March 19, 1888.

1. If, by means of any trick or artifice, the owner of property is induced to part with the possession only, still meaning to retain the right of property, the taking by such means will amount to larceny, provided it be done animo furandi.

2. But if the owner part with not only the possession of the goods but the right of property in them also, the offence of the party obtaining them will not be larceny, but the offence of obtaining goods by false pretences.

3. The jury found a special verdict setting forth that the bank held the promissory note of the defendant, indorsed by one John Eichelberger, for $1,600; that on July 21, 1886, he called at the said bank to renew the note; that he paid the discount thereon for another period of 90 days, viz.: $25.07; that he obtained his said note of $1,600 by giving the cashier a new note for $16.00, with the same indorser; that when the cashier received the note for $16.00, he believed he was getting a note for $1,600, and would not otherwise have surrendered the old note; that the defendant made and presented the note for $16.00 with the deliberate design and intention to defraud said bank by obtaining from it said note for $1,600 by giving in its place one for $16.00 only, and with the design and intention that the officers of the bank should overlook the fact that the note offered was for $16.00 only; and that by reason of such oversight and mistake should give up the note for $1,600: Held, that upon the above state of facts the defendant was guilty of larceny.

4. It is not error to take a special verdict in a criminal case, especially where the facts are peculiar and the case itself lies upon the border: Commonwealth v. Chathams, 50 Pa. 181, followed and approved.

---

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

Nos. 245 and 246 January Term 1887, Sup. Ct.; court below, No. 61 January Term 1886.

On November 8, 1886, an indictment was found charging Samuel K. Eichelberger with the larceny of a promissory note, the property of the Coopersburg Savings Bank, dated April 19, 1886, for $1,600, payable at ninety days to the order of John Eichelberger and indorsed by John Eichelberger.

At the trial on November 10, 1886, after the case was closed on the evidence, the court, ALBRIGHT, P. J., charged the jury:

In a criminal case the jury are the judges of the law and the facts. The court can say to the jury that if they find certain facts, then under the law they can convict, but the jury has the right in any case to acquit the defendant. You have a right to acquit the defendant notwithstanding what the court may say to you respecting this case. I propose to recommend that you find a special verdict; that is, that you find the facts in the case; that you state upon record by your verdict what the facts are, then the court will hereafter determine whether what you find constitutes the crime of larceny.

In the opinion of the court it is a grave question whether what the defendant did according to the prosecutor's statement and the testimony of Mr. Blank, constitutes larceny. It may be a criminal offence, it may come under some other head of the criminal law, but whether it is larceny, whether it is the felonious taking of the property of another, is a serious question. The court, if called upon at this moment to decide the question, would say to you that under the evidence before you, you could rightfully convict the defendant. If the court were not of that opinion, it would be its duty to instruct you to return a verdict of not guilty. But the court is willing to look further into the question of law and see whether what is alleged constitutes larceny. If you believe what has been testified to in behalf of the prosecution, you may render a special verdict. At the same time you have a right to find a verdict of not guilty.

When the court says to you that the evidence in this case is such that it warrants conviction, that statement is based

upon the opinion that where a person intending to deprive another of a piece of personal property by artifice, trick or contrivance, gets possession of the property intending at the time when he gets possession of it, to retain it against the owner's consent and that he will appropriate it to his own use, then larceny is committed. . . . . .

The court will send out with you a statement of certain facts. You need not be guided by this writing at all; it is only for the purpose of calling attention to what you are to pass upon and make answer to, when you return to the jury box to give your verdict. When you have agreed we will ask you what facts you have found. You can read over what is here written, so that when you are asked as to the facts you can answer.

The defendant excepted to the charge of the court, and objected also "to the paper called a form of a special verdict," and asked that a bill of exceptions be sealed because the same was sent to the jury without his consent.

The jury, in pursuance of the foregoing instructions, returned the following:

We, the jurors impaneled in this case, find the following facts :. On July 21, 1886, the Coopersburg Savings Bank was the holder and owner of a promissory note, made by the defendant and indorsed by John Eichelberger, of which the following is a copy:

$1,600. COOPERSBURG, April 19, 1886.

Ninety days after date, I promise to pay to the order of John Eichelberger, at the Coopersburg Savings Bank, sixteen hundred dollars, without defalcation for value received.

Credit the drawer. S. K. EICHELBERGER.

JOHANNES EICHELBERGER.

Endorsed—JOHANNES EICHELBERGER.

Said note was the last of a number of like notes, given during a period of three years, each being a renewal of the one immediately preceding it, which had been discounted by said bank, the defendant having received the proceeds thereof.

On July 21, 1886, defendant called at said bank's place of business, found there George Blank, Esq., the cashier of the

bank, and had a certain business transaction with him respecting said note of April 19, 1886, and the renewal thereof. Defendant then paid to the cashier the discount for a renewal of the last-mentioned note—the discount, which would have been due on a similar note, for another period of ninety days, that is $25.07, and gave to said cashier another note of which the following is a copy:

$16.00.                    COOPERSBURG, PA., July 21, 1886.

Ninety days after date, I promise to pay to the order of John Eichelberger, at the Coopersburg Savings Bank, sixteen dollars, without defalcation for value received.

Credit the drawer.                    S. K. EICHELBERGER.
JOHANNES EICHELBERGER.

Endorsed—JOHANNES EICHELBERGER.

Thereupon said Blank delivered to the defendant said note, of date of April 19, 1886, and then defendant left the bank, taking with him the said note so given to him.

Said Blank, when he accepted said note for sixteen dollars, believed that it was for sixteen hundred dollars, and, because he so believed and for no other reason, he was willing to surrender and did surrender to the defendant said note of April 19, 1886. He did not discover until about an hour after defendant had left the bank that it was for sixteen dollars only. The bank afterwards requested the defendant to pay sixteen hundred dollars; that is, after it would have been due if said note for sixteen had been written for sixteen hundred dollars. Defendant never paid said sum of sixteen hundred dollars, nor any part thereof. The bank never again received said note of April 19, 1886.

The bank still holds said note for sixteen dollars. Defendant said nothing to the cashier as to what amount the note of July 21, 1886, was written for.

When defendant delivered to the cashier the note for sixteen dollars, he knew that it was for sixteen and not for sixteen hundred dollars; that the cashier, in giving up the note for sixteen hundred dollars, was mistaken in that he had overlooked the fact that it was for sixteen dollars only; defendant knew when the note for sixteen hundred dollars was surrendered to him, that the cashier believed he had received another

note for sixteen hundred dollars, and that if the cashier had not so believed he would not have given up the note.

The defendant made and presented the note for sixteen dollars with the deliberate design and intention to defraud said bank by obtaining from it said note for sixteen hundred dollars by giving in its place one for sixteen dollars only, and with the design and intention that the officers of the bank should over-look the fact the note offered was for sixteen dollars only, and that by reason of such oversight and mistake, should give up the note for sixteen hundred dollars.

If the facts stated and the acts of the defendant above set forth are sufficient in the opinion of the court to warrant a conviction of the defendant, of the crime of larceny, then the jury do say that he, the defendant, is guilty of larceny in man-ner and form as he stands indicted. If not sufficient, then the jury find the defendant not guilty.

On December 24, 1886, the district attorney moved the court to adjudge the defendant guilty in manner and form, etc., and to pass sentence.

On the same day the defendant's attorneys moved the court to enter judgment upon the verdict in favor of the defendant, and also moved the court in arrest of judgment, alleging for cause:

1. There is no authority in law for the form of the verdict rendered by the jury. 2. The jury never passed upon the guilt or innocence of the accused. 3. The jury never considered the law of the case. 4. A question of law cannot be reserved in a criminal case, and the court in the charge practically reserved a question of law; therefore the judgment must be arrested.

On January 3, 1887, these several motions were disposed of by the following opinion and order, ALBRIGHT, P. J.:

By the court: In the case of Lewer v. Commonwealth, 15 S. & R. 93, the indictment was for larceny. The jury found the facts specially, submitting to the court the question whether under the facts the defendant, Lewer, was guilty of larceny. The jury found that the defendant, by various false and fraud-ulent pretences set forth in the finding, did procure from the prosecutors sundry dry goods and money; that he acted with

the premeditated design and intent wilfully to defraud and cheat them of their property and without any intention of ever returning the same to the rightful owners. The Court of Quarter Sessions held that the facts found constituted larceny. That judgment was reversed by the Supreme Court.

In the opinion, TILGHMAN, C. J., after reviewing certain English cases, points out the distinction in the cases where the property, alleged to have been stolen, was obtained by trick or artifice, between the intent of the owner to part with the property and the intent only to part with the possession for a particular purpose. He declared the law to be that where the owner delivered the possession absolutely, where the intent was that the possession should never return to him, it was a case of cheating and not of felony; but that where the owner intended to part with the property the case was different, then there might be a conviction of larceny. The chief justice said that thus there was a line distinctly marked and that he would stop there. Applying said principle to the case, the court concluded that, while Lewer had deceived the prosecutors most shamefully, he was not guilty of larceny, because the prosecutors intended to pass the property when they delivered the possession. There has been no decision of the Supreme Court since, changing or qualifying the rule thus laid down.

In the case now before the court, the cashier of the bank surrendered and delivered to the defendant the promissory note alleged in the indictment to have been stolen, not with the intent that the defendant should have the possession thereof only for some purpose and that it should again be returned to the bank, but with the intent that he should keep it and do with it what he pleased; the property itself was delivered. The cashier believed that he had received a new note for $1,600, and for that reason was willing to give up, and actually did give up absolutely, the old note. Therefore, according to the case cited, it cannot be adjudged that defendant is guilty of larceny, however dishonest and outrageous his conduct may have been.

Upon the trial, and again upon the argument of these motions, many English and American cases were referred to by counsel for the commonwealth and for defendant; but, as

said case of Lewer v. The Commonwealth is now deemed to be decisive of this case, it is unnecessary to dwell on said other cases.

There is no need to discuss the other question presented, that is whether the rule of law, which declares that in a criminal case the jury are the judges of the law and the facts, forbids the finding of the facts specially and the application of the law by the court. In Commonwealth v. Chathams, 50 Pa. 181, which was also a prosecution for larceny where there was a special verdict, it was decided that such proceeding was proper, that the jury have a right in all cases whatever, whether capital or otherwise, to find a special verdict by which the facts of the case are put on record and the law is submitted to the judges. I can see nothing in Kane v. Commonwealth, 89 Pa. 522, as explained in Nicholson v. Commonwealth, 91 Pa. 390, to lead me to believe that the law is no longer as laid down in Commonwealth v. Chathams. Of course the jury have a right to render a general verdict of acquittal, and, I think, where they are invited to find the facts specially, they ought to be plainly told that they have a right to acquit. In this case the jury were told that distinctly, and that they were the judges of the law and the facts. . . . . .

Judgment on the special verdict was then entered for the defendant and the motion for judgment for the commonwealth overruled, the court directing that the defendant should not be discharged from his recognizance, but that if within two weeks the district attorney gave notice of his intention to take a writ of error, the defendant's recognizance should then be renewed. The commonwealth thereupon took this writ, assigning as error:

1. The entering of judgment on the special verdict for the defendant.

2. The overruling of the motion for judgment for the commonwealth.

*Mr. R. E. Wright* (with him *Mr. J. Marshall Wright* and *Mr. M. C. L. Kline, District Attorney*), for the plaintiff in error:

1. In Lewer v. Commonwealth, 15 S. & R. 93, there was an absolute sale and delivery of goods to the defendant. The

seller got just what he agreed to take, to wit, the check. Placing trust and confidence in the buyer's statements, he parted with his goods on that footing, intending to do so. The case is therefore inapplicable. In the case at bar, the cashier never reposed any trust or confidence in the defendant; he gave him no credit; was deceived by no promises or representations; was not lured by fraud into any agreement or consent to part with the title or possession of the note except upon a condition that was to be performed contemporaneously with the delivery of the note—a condition which was a part of the transaction of the moment, and without which the cashier never agreed nor intended to part with the title or possession.

2. When the owner is not to part, either with the possession of or property in the chattel, until a condition is performed, the chattel remains in legal contemplation under the owner's control and in his possession, and the fraudulent taking of it is larceny: Hildebrand v. The People, 11 Sickels 394; Loomis v. The People, 22 Sickels 321; Shipply v. The People, 41 Sickels 375; The Justices v. The People, 45 Sickles 12; Commonwealth v. Barry, 124 Mass. 325; Regina v. Middleton, 1 Green Cr. L. R. 10; Regina v. Slowly, Idem 30; Regina v. Rodway, 38 E. C. L. R. 453; Rex v. Bingley, 5 E. C. L. R. 602; Commonwealth v. Wilde, 5 Gray 83; Commonwealth v. O'Malley, 97 Mass. 584; Commonwealth v. Barry, 125 Mass. 390; Bailey v. State, 58 Ala. 414; Grunson v. State, 89 Ind. 533 (46 Amer. R. 178); Walters v. State, 17 Tex. App. 266 (50 Amer. R. 128); Reg. v. Little, 10 Cox C. c. 559; Reg. v. Webb, 5 Cox C. C. 154.

*Mr. Edward Harvey* (with him *Mr. M. C. Henninger* and *Mr. A. G. Dewalt*), for the defendant in error:

1. The definition of larceny generally accepted as the best is, "the wrongful or fraudulent taking and carrying away by any person of the mere personal goods of another, from any place, with a felonious intent to convert them to the taker's own use and to make them his own property, without the consent of the owner:" 2 East P. C. c. 16. Blackstone omits the words, "without the consent of the owner," and Dr. Wharton says that because of this omission his definition is

defective: 1 Whart. Cr. L., § 862. There must be a trespass and a felonious intent to constitute the offence: Thorne v. Turck, 94 N. Y. 90; 2 Arch. Cr. Pr. & Pl. 264; 2 Russ. on Cr., 152, 189; 2 Bish. Cr. L., §§ 808, 817.

2. If the possession and title to personal property is voluntarily given to another, no matter how grossly or fraudulently the owner may have been persuaded to do it, there is no larceny: Basset v. Spofford, 45 N. Y. 392; Elliott v. Commonwealth, 12 Bush 176; Kelly v. The People, 13 N. Y. Sup. Ct. 509; Welsh v. The People, 17 Ill. 339; Wilson v. The State, 1 Porter 118: Ross v. People, 5 Hill 294; Mowrey v. Welsh, 8 Cow. 238; Powell v. Heyland, 6 Exch. 70; Regina v. Thomas, 9 C. & P. 741 (38 E. C. L. R.); People v. McDonald, 43 N. Y. 61; Smith v. People, 53 N. Y. 111; Thorne v. Turck, 94 N. Y. 90; 2 Russ. on Cr., 200. Lewer v. Commonwealth, 15 S. & R. 93, is directly in point. It was cited by this court in Commonwealth v. McEwen, 1 Clark 145, and its authority recognized in Commonwealth v. Lovell, 2 Phila. 385, where it was said: "If he consent to abandon his property in the article, though he may have been deluded by gross fraud, the taking is not larceny." We cite also: Reg. v. Wilson, 8 C. & P. 111 (34 E. C. L. R.); Harvey's Case, 1 Leach 467 (2 East P. C. 16); Parkes's Case, 2 Leach 614 (2 East P. C. 16); Regina v. Adams, 1 Denn. C. C. 38; Regina v. Barnes, 2 Denn. C. C. 59.

3. This court is asked to adjudge the defendant guilty and award a procedendo that he may be sentenced upon the special verdict, but we submit that such action may not be taken. This record is so made up that no judgment can be entered against the defendant, who has secured to him the constitutional right of trial by jury. The jury is to judge of the law and the facts: Kane v. Commonwealth, 89 Pa. 522; Nicholson v. Commonwealth, 91 Pa. 390. It is the right of the defendant in a criminal case to have the jury pass upon the whole case: Hutchison v. Commonwealth, 82 Pa. 478; and to render a verdict of guilty or not guilty: Commonwealth v. Knapp, 10 Pick. 495; People v. Crosswell, 3 Johns. Cas. 377; otherwise trial by jury would eventually become trial by court and jury.

OPINION, MR. JUSTICE PAXSON:

The defendant was indicted for larceny. The jury found a special verdict, from which we learn that the Coopersburg Savings Bank held his promissory note, indorsed by John Eichelberger, for the sum of sixteen hundred dollars; that on July 21, 1886, he called at said bank to renew the note; that he paid the discount thereon for another period of ninety days, viz.: $25.07; that he obtained his said note of sixteen hundred dollars by giving the cashier a new note for sixteen dollars with the same indorser; that when the cashier received the note for sixteen dollars, he believed he was getting a note for sixteen hundred dollars, and would not otherwise have surrendered the old note; that "the defendant made and presented the note for sixteen dollars with the deliberate design and intention to defraud said bank by obtaining from it said note for sixteen hundred dollars by giving in its place one for sixteen dollars only, and with the design and intention that the officers of the bank should overlook the fact that the note offered was for sixteen dollars only, and that by reason of such oversight and mistake should give up the note for sixteen hundred dollars." The special verdict further sets forth that "if the facts stated and the acts of the defendant above set forth are sufficient in the opinion of the court to warrant a conviction of the defendant of the crime of larceny, then the jury do say, that he, the defendant, is guilty of larceny in manner and form as he stands indicted. If not sufficient, then the jury find the defendant not guilty." The learned court below entered a judgment for the defendant upon the facts as found by the jury.

It is difficult to imagine a more dishonest fraud than the one above stated. We must be careful, however, that in our just indignation of so palpable a trick we are not carried beyond the line of recognized law. It is for the legislature to say what offences shall constitute larceny; our duty ends with declaring whether the case comes within the act of assembly.

Just here it is proper to say that in the argument at bar the right was questioned of taking a special verdict in criminal cases. It is rarely done, because a case seldom arises in which such a course is useful or necessary. In the case in hand, we think the learned judge below acted wisely in requesting the

jury to find the facts specially. They were altogether peculiar, if not without precedent, and the case itself lies upon the border. The right of the court to take a special verdict in criminal cases was decided in Commonwealth v. Chathams, 50 Pa. 181, and the same rule has been laid down in at least two recent cases not yet reported.

It was held by the court below that the case was ruled by Lewer v. Commonwealth, 15 S. & R. 93. It was in the application of that case to the facts of the present one that we think the learned and able judge inadvertently fell into error. Lewer v. Commonwealth was well decided and we adhere to every word there said. That was a case, however, of a sale and delivery of certain merchandise to one M. D. Lewer, who falsely represented himself as the agent of his brother. It was not pretended that the owners of the merchandise did not intend to part with both the title to and the property therein; they were simply overreached by means of the above and other false statements, and sold and delivered their goods to a knave. It was a case of cheating by false pretenses, nothing more; the purchaser obtained a credit by means of false representations.

The ingenuity of the learned counsel has furnished us with a large array of authorities on both sides of this interesting question, but it would occupy too much space to refer to them in detail. I had occasion several years ago, when occupying a seat on the bench of the Common Pleas of Philadelphia, to examine the question of constructive larceny with considerable care in the case of Commonwealth v. Yerkes, 29 Leg. Int. 60, and to which I take the liberty to refer as the only Pennsylvania case which is upon all fours with this.

It was there said: " The distinction between larceny and false pretenses is a very nice one in many instances. In some of the old English cases, the difference is more artificial than real and rests purely upon technical grounds. Much of this nicety is doubtless owing to the fact that at the time many of the cases were decided, larceny was a capital felony in England, and the judges naturally leaned to a merciful interpretation of the law out of a tender regard for human life. . . . . . The distinction between larceny and cheating by false pretenses is well stated in Russel on Crimes, 5th Amer. ed., 28. After an

exhaustive review of the cases the learned author says : 'The correct distinction in cases of this kind seems to be, that if by means of any trick or artifice, the owner of property is induced to part with the possession only, still meaning to retain the right of property, the taking by such means will amount to larceny; but if the owner part with, not only the possession of the goods but the right of property in them also, the offence of the party obtaining them will not be larceny, but the offence of obtaining goods by false pretences.'"

I could not add to this were I to write a volume. It is the principle running through all the cases, including Lewer v. Commonwealth. The rule itself is distinct and clearly cut; the difficulty consists in its application to the facts of each particular case, varied as they are by the ingenuity of the particular rogue who makes the facts. It remains to apply the rule to this case.

The defendant was indicted under section 104 of the Crimes Act of March 31, 1860, for the larceny of a promissory note of the value of sixteen hundred dollars, the property of the Coopersburg Savings Bank, and the jury have found that it was obtained animo furandi. The bank parted with the possession ; if it also intended to part with its property represented by the note, we have no hesitation in saying the offence of the defendant was not larceny, whatever else it may have been.

In considering this question regard must be had to the nature of the property alleged to have been stolen. It was a promissory note, as before stated, of the value of sixteen hundred dollars. What gave it that value ? Certainly not the paper upon which it was written, for that was of so inconsiderable value as not to be the subject of larceny. It was clear that it was valuable only in so far as it was a representative of money ; as the evidence of a debt which the bank held against the defendant. The bank did not intend to part with its property in this note considered as an evidence of debt. The note was not the debt; it was the mere evidence of it. That it did not intend to part with any right of property, is manifest from the fact that the cashier thought he was receiving in exchange for the note parted with, a similar evidence of such debt, of equal amount and of equal value. It would be the baldest technicality, a mere sticking in the bark,

Commonwealth v. Yerkes.

to hold that the bank intended to part with any right of property by a mere delivery to the defendant of a piece of paper which, qua paper, was of no value. It did not intend to deliver the evidence of its debt to the defendant, because it supposed it was getting another of equal value and would have received it, but for the trick and fraud of the defendant. In the absence of any decision of this court fully covering the facts of the case it was natural and proper for the learned judge below to give the defendant the benefit of the doubt which he evidently entertained. Were we in doubt we would do likewise, but we are all of opinion that upon the facts found by the jury the offence is larceny.

The judgment is reversed, and it is ordered that the record be remitted with instructions to the court below to enter judgment for the commonwealth, and to proceed to sentence the defendant according to law.*

### COMMONWEALTH V. CHARLES T. YERKES, JR.

Opinion by PAXSON, J., February 10, 1872.

This was a motion for a rule for a new trial. The defendant was convicted generally upon an indictment containing four counts. On the first count he was charged with the larceny of a check for $33,048.50, the property of the city of Philadelphia. The second count charges that the defendant, being at the time in the employment of the city of Philadelphia, by virtue of such employment did receive and take into his possession, a certain check or order for the payment of $33,048.50, the property of the city of Philadelphia, and did fraudulently and feloniously embezzle the same. The third count charges the defendant with larceny as bailee of said check; and the last count is the same as the second, with this difference, that it charges the defendant with the larceny of the money instead of the check.

The facts of the case briefly stated are as follows: The defendant, at the time of the commission of the alleged offence was, and for a considerable period prior thereto had been, the broker, or agent, of the treasurer of the city of Philadelphia,

* "The reporter is requested to add, as a note or supplement to the report of this case, the opinion of PAXSON, J., in Commonwealth v. Yerkes, 29 Leg. Int. 60."

to make sales of certain loans of the latter, and also to pur-
chase the stock or loan of the city for the sinking fund
thereof, at such times and for such amounts as the city treas-
urer should designate.

On the first day of October last, there was placed to the
credit of the defendant upon the books of the city treasurer,
$145,000 of the loan of the city for sale. No certificates for
this loan were issued to the defendant. They were made out
upon the order of the defendant, from time to time, in favor
of the parties to whom he sold the loan. By an arrangement
with the city treasurer, the defendant settled with the former
at the end of each month for the sales for the month. It will
thus be seen that while the defendant was not the owner of
this loan in any sense, he yet had the control of it for an en-
tire month. The practical effect of it was, that when he failed
upon October 16th, the whole of this loan had been converted
to his own use, and the city became the loser thereof.

It further appeared that on the second of October last, the
defendant obtained the sum of $300,000 from the treasury of
the city, in the form of a loan, for which his due bill, payable
on demand was given. This was in direct violation of law,
and subjected all the parties to the transaction to indictment,
and to a heavy fine and imprisonment in case of conviction.

In the early part of the month of October there was a se-
vere pressure in the money market, occasioned principally, if
not wholly, by the unfortunate conflagration of Chicago.
The defendant, who carried on an extensive business as a
banker and broker, became seriously embarrassed for money.

This was the condition of things upon Saturday, the 14th
day of October. Upon that day, the defendant called at the
office of the city treasurer about 2 o'clock P. M., and informed
David Jones, the chief clerk, that he had purchased $33,000
of stock for the city. The witness says, it was understood to
be for the sinking fund, although the defendant did not say so
in terms. But as the defendant had made prior purchases for
the sinking fund, was not authorized to purchase stock for the
city upon any other account, there is no reason to doubt that
it was entirely understood by both that the stock referred to
was for the sinking fund. Whilst the defendant was there,
his messenger, a boy, came into the treasurer's office, with a

bill or memorandum of the alleged purchase, whereupon the chief clerk filled up a check, which had been signed in blank by Mr. Marcer, city treasurer, for the amount, and the same was given to the boy in the presence of the defendant, who took it to the place of business of the latter. The check was drawn against the funds of the city deposited to the credit of the sinking fund, and so appeared upon its face. It was not applied by the defendant to the payment of the stock so alleged to have been purchased. In fact no such purchase had been made by the defendant, and within an hour after obtaining the said check, it was converted to his own use by depositing it in bank, and checking it out again to pay his own debts. His bank account on that day showed his entire balance drawn out, save the merest trifle, and leaves little room to doubt that but for this check, the defendant would have failed on that day. He did fail the next business day, to wit, Monday, October 16th.

Upon the trial of the case I practically reserved the law upon the last three counts, with an intimation to the learned counsel for the defendant that if the jury were against them upon the facts, we would settle the law upon a motion for a new trial. Subsequent reflection has satisfied me that upon neither of the said counts can the verdict be sustained. My learned colleagues, who were kind enough to sit with me upon the argument of the motion for a new trial, all concur in this view. It is sufficient to say, as to the second and fourth counts, that the defendant was not in the employment of the city, in the sense in which that term is used in the Criminal Code. The term employment means a continuous employment, and exclusive in its nature; not the mere acting as a broker or agent in particular transactions, although of frequent occurrence. Speaking for myself, it may perhaps be questioned whether the 107th section of the code applies to persons in the employment of a municipal corporation. The act reads : " If any clerk, servant, or other person in the employ of another, shall," etc., etc. " In the employ of another," manifestly means in the employ of another person, and would seem to refer to a natural person, rather than to a municipal corporation. This view is strengthened by the fact, that the distinction between natural persons and corporations, municipal or

otherwise, is carefully preserved in many sections of the Criminal Code. We refer to this point, however, without deciding it, as upon the other ground mentioned, the verdict upon the second and last counts, as before stated, must be set aside.

In reference to the third count it is sufficient to say, that there was no bailment. Had the defendant purchased the stock, and been intrusted with the said check for the purpose of delivering it to the vendor of said stock, it is possible there would have been a bailment. But such is not this case. We do not think there was evidence to establish a bailment.

This brings us to the question, whether the conviction of larceny upon the first count in the indictment can be sustained. This is really the vital point in the case.

It is to be observed that the count in question rests entirely upon statute. There was no such thing known to the common law as the larceny of a check, qua check. It is true an indictment would lie for the larceny of a check as a piece of paper, of the value of a fractional part of a penny, but as a valuable piece of property, representing the dollars which it named, a check was not the subject of larceny. To remedy this evil, our Criminal Code, § 104, has expressly made it larceny to steal checks, and other securities. A similar statute exists in England, from which the section above referred to is in the main copied. So that at the present time a check is as much property, and the subject of larceny, as a horse or a bale of muslin; and it is to be treated, not as a mere piece of paper, but as the representative of the money which it calls for, and of a corresponding value. This case is to be considered precisely as if the defendant, instead of obtaining a check, had obtained the money from the city treasury.

It was urged upon the argument that the stealing of a check, in the hands of the drawer, before it had been put into circulation, was not larceny. It is difficult to see the soundness of this view. The value of a check consists in its being the representative of money, in being an order or paper, by the presentation of which at the proper place a certain sum of money can be obtained. The moment the maker has filled it up and signed it so as to enable the holder to draw the money its value attaches, and it becomes property, to steal which, is larceny. This point has been expressly ruled in England. In

Rex v. Metcalf, 1 Moody, E. C. C., 433, the prisoner was indicted for stealing a check. The check was drawn to bearer, and given by the drawer to the prisoner for a specific purpose, to wit: to deliver to the Messrs. Caldecott. Instead of doing so, the prisoner applied it to his own use. He was found guilty of the larceny of the check. Upon the trial the question was reserved, "whether the check in the hands of the drawers was of any value, and could be the subject of larceny?" The case was considered and the judgment affirmed, eight of the nine eminent judges who heard the case concurring; only one of them, LITTLEDALE, expressing a doubt. We are of opinion that the moment this check was so far completed as to enable any one obtaining it to draw the money, it was the subject of larceny in the hands of the city treasurer. We do not regard the fact that the check, after its payment by the bank, was returned to the city treasurer, affects this view of the case. It came back, it is true, so far as the piece of paper was concerned, but its value, that for which the law makes it the subject of larceny, was gone. Here again we must keep in mind the distinction between the check as a thing of value— as the equivalent of $33,000, and a worthless piece of paper. Every check stolen from the drawer must come back to him in case of its conversion by the thief, and we have seen in Rex v. Metcalf that a check is the subject of larceny in the hands of the drawer. It is immaterial what became of the check after it reached the possession of defendant, if it were obtained feloniously, as in the latter case; the offence was complete the moment it was so obtained.

But it was strongly urged by the learned counsel for the defendant that the offence, at most, was but a false pretence, and that in any event it was not larceny because there was no felonious intent.

The distinction between larceny and false pretences is a very nice one in many instances. In some of the old English cases the difference is more artificial than real, and rests purely upon technical grounds. Much of this nicety is doubtless owing to the fact that at the time the cases were decided larceny was a capital felony in England, and the judges naturally leaned to a merciful interpretation of the law, out of a tender regard for human life. But whatever may have been the cause, the law

has come down to us with such distinctions, and we propose to administer it as we find it. It is not our purpose to go a hair's breadth beyond the decided cases.

The distinction between larceny and false pretences is well stated in Russel on Crimes, 5th Amer. ed., 28. After an exhaustive review of the cases, the learned author says : " The correct distinction in cases of this kind seems to be, that if by means of any trick or artifice the owner of property is induced to part with the possession only, still meaning to retain the right of property, the taking by such means will amount to larceny ; but if the owner part with, not only the possession of the goods but the right of property in them also, the offence of the party obtaining them will not be larceny, but the offence of obtaining goods by false pretences."

A review of the numerous cases cited upon the argument would be interesting, but would exceed the limits of this opinion, and the result would be to bring us to the principle above cited. By that principle this case must stand or fall, so far as this branch of it is concerned. The difficulty, if any, is not in the law ; that is uniform, and easily understood. But it is in applying the facts of each particular case to the law, and thus to ascertain what offence, if any, has been committed. It will be our endeavor to subject this case to this test.

It must be conceded, that if the city intended to part with its property in this check, at the time the defendant obtained it, and not with the possession only, then the offence would not amount to larceny. As if a man enter a store, and by reason of a false statement induce the owner to sell him a bill of goods upon credit ; here the vendor of the goods parts with the property in said goods absolutely, and the relation of debtor and creditor is created. The merchant may have been overreached, but it is not larceny—at most a false pretence. Did the city intend in the case now under consideration to part with its property in the check, regarding said check as we are bound to do, as the representative and equivalent of $33,000 ? Certainly not, as in favor of the defendant. The city did not owe him a dollar. The latter was the broker or agent of the city, for two purposes, viz.: to sell city loan, and to purchase, when required, loan for the sinking fund. There was no other relation existing between the city and the defend-

ant. Webster defines a broker to be " an agent or negotiator, who is employed by merchants to make and conclude bargains for them, for a fee or rate per cent., or who transacts other business for his employers. Stock brokers are such as are employed to sell shares in the stocks, whether of the public fund, of banks, or of other corporations." A higher authority, Judge STORY, in his work on Agency, says : " The true definition of a·broker seems to be, that he is an agent, employed to make bargains and contracts between other persons, in matters of trade, commerce or navigation for a compensation, commonly called brokerage. Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him" : Story on Agency, § 30. There are various sorts of brokers now employed in commercial affairs, whose transactions form, or may form, a distinct and independent business. Thus, for example, there are exchange and money brokers, stock brokers, ship brokers and insurance brokers, who are respectively employed in buying and selling bills of exchange, or promissory notes, or goods or stocks, or ships and cargoes, or in procuring insurance and settling losses, or in procuring freight or charter parties: Story on Agency, § 32.

But in all these different classes there is this one prominent feature, that they are mere agents, who transact business for a principal, for a fee or commission. If A. employ a broker, B., to purchase for his account $1,000 of city loan, or other stocks, B. thereupon becomes the agent of A. No other relation exists between them. If, in pursuance of such employment, B. purchases the stock from C., the legal effect of the transaction is, that C. is bound to deliver the stock to A., and the latter becomes the debtor of C. to the amount. And if A. deliver to B. the money to pay C. for the stock, and B., instead of doing so, converts it to his own use, he is a thief, both in law and morals. Nor does it make any difference whether B. discloses his principal to C. or not. The only effect of such non-disclosure would be, that C. would have no remedy against A. for the price of the stock. He would be compelled to look to the broker only. But in the case just put, the broker still remains the agent of A. I am aware that a rule exists at the board of brokers of holding each broker purchasing stock per-

sonally responsible for the amount of his purchase, whether he disclose the name of his principal or not. With this the person who employs a broker has nothing to do. It is not in the power of the latter, nor of any board of brokers, to alter the law, or to change a relation that is fiduciary in its character into the ordinary relation of debtor and creditor. It is objected that the application of such a rule as this would seriously embarrass the stock operations of brokers. With that we have nothing to do. We do not make the law. We merely declare and enforce it. But it is difficult to see how a rule which rests upon the solid foundation of common honesty can be productive of any serious results. It may, perhaps, interfere with financial kite-flying and wild speculations with the money of other people, but not with any legitimate operations. It is not too much to hold, that when a broker receives the money of another to invest in a certain security, that he shall so invest it, or be responsible to the criminal law. It would be monstrous that the broker should lose it in speculation, and then turn round to his victim and say, it is true, I have converted your money to my own use; I can neither repay you nor give you the stock; it is a mere matter of contract—I am your debtor, and you are my creditor for the amount.

In this case the defendant was the agent of the city, to purchase for account of the latter, stock for the sinking fund. He alleged that he had purchased from some one—no matter who—stock to the amount of $33,000. Supposing his statement to be true, the check was given to him. Given to him for what? To pay his own debts within an hour? Certainly not. It was given him to pay for the stock. The city never intended to part with the ownership in the check. It went out in the shape of money, for the money and the check are precisely the same thing for the purposes of this case. It was to come back in the shape of stock for the sinking fund. The city was neither to gain nor lose by the transaction. The $33,000 was still to remain the property of the city, in an altered shape it is true, but of equal value.

We do not think this a case of false pretences, because there was not any intention on the part of the city officers to part with the property in the check, but with the possession

Commonwealth v. Yerkes.

merely; and no relation of debtor and creditor arose out of the transaction.

Was the offence larceny? It is conceded that the possession of the check was parted with by Mr. Jones, to the defendant. The latter did not snatch it up and run away with it. But it is alleged by the commonwealth, and the jury have so found, that the defendant resorted to an artifice, a fraud by means of which Mr. Jones was deceived, and induced to part with the possession of the check. The rule of law is well settled, that if the possession of property is obtained by an artifice, accompanied with the felonious intent on the part of the person obtaining it to convert it to his own use, and if he does so convert it, the offence is larceny. This principle is thus recognized in Wharton, 6th ed., § 1847 : " Larceny may be committed of goods obtained from the owner by delivery if it be done animo furandi. When the offender unlawfully acquired possession with an intent to steal them, the owner still retaining the property in them, such person will be guilty of larceny in embezzling them." In illustration of this doctrine, the learned author cites in the section referred to, the familiar case of hiring a horse on pretence of making a journey, and immediately selling it. This is larceny, provided the jury find that the defendant acted animo furandi in making the contract.

" Where a man, having the animus furandi, obtains in pursuance thereof possession of the goods by some trick or artifice, this is considered such a taking, even although there be a delivery in fact, as to constitute larceny: " The State v. Gorman, 2 Nott & McCord, 90 ; Starkie v. The Commonwealth, 7 Leigh 752 ; The State v. Thurston, 2 McMullen 382, 395, and other cases cited in note to Commonwealth v. James, 2 Heard, L. C. C., 192.

In Regina v. Johnson, 14 E. L. & E. 570, the prisoners were indicted for larceny. By trick and fraud they had induced the prosecutor to draw a check to one of the prisoners " or bearer " for £42. He accompanied one of them to the bank to see it cashed, upon the understanding that prisoner was to return with him to his shop and hand over to him forty-two sovereigns, which the other prisoner retained at the shop. At the bank he handed the check to the prisoner, directing him

to get four ten pound notes and two sovereigns in change. The prisoner obtained the change and eloped, and his confederate had also eloped with the forty-two sovereigns when the prosecutor returned to his shop.   The chairman of the Quarter Sessions put the following questions to the jury, and the jury found the following answers :

1. Did the prisoners throughout intend to get the property of the prosecutor into their possession by fraud, and apply it to their own use ?   Answer : Yes.

2. Did the prosecutor intend to part with his property in the check and change, until Johnson returned with them and the prosecutor received the forty-two sovereigns ?   Answer : No.

Lord CAMPBELL, C. J., delivered the opinion of the court. He says : " The jury have found that the prisoners throughout intended to get the property of the prosecutor into their possession by fraud, and apply it to their own use."   The conviction of larceny was sustained.

In Regina v. Heath, 2 Moody C. C. R. 33, the prisoner was intrusted with a check drawn to bearer, with instructions to deliver the check, but appropriated it to his own use.   Held to be larceny of the check.

In Regina v. Perry, 1 Denn. C. C. R. 69, the defendant was convicted of larceny of a check, given him to pay to the overseers of the poor, and for which he was to get a receipt, but he appropriated the money to his own use.   Some doubt arose whether the conviction was good, the check not being stamped according to law, but the judges held that the conviction on the second count, for " stealing a piece of paper of the value of one penny was good."

Regina v. Brown, 1 Dears. C. C. 616, was an indictment for larceny.   Prosecutor owed some money to Mr. Staines, and said to his servant in the hearing of the prisoner : " George, you must go to Mr. Staines and pay him this money," and thereupon prisoner said he was going that way, and offered to take it.   Induced by the offer of the prisoner, the prosecutor gave him the money to carry to Mr. Staines, in discharge of the debt.   Prisoner's statement was false, and he converted the money to his own use.   The jury were told that the prisoner was guilty of larceny, if they were of opinion that he

obtained the property by a trick, and meant at the time to appropriate it to himself, but that if he took it from the prosecutor bona fide, it was not larceny. The case was reserved, and the court held the conviction right.

In Regina v. Aickles, 2 East's P. C. 675, the prosecutor and the defendant had agreed that the defendant should discount a bill, and for that purpose a bill was given him, when the defendant told the prosecutor that if he then sent a person with him to his lodgings, he would give him the amount deducting commission and discount; a person was sent accordingly, but upon reaching the lodgings, the defendant left the messenger there, and went out under the pretence of getting the money, but never returned. Held to be larceny.

In Regina v. Robins, 29 E. L. & E. 544, some wheat, not the property of the prosecutors, but which had been consigned to them, was placed in one of the storehouses in care of a servant, E, who was to deliver the wheat only to the orders of the prosecutors, or their managing clerk, C. The prisoner, who was in the employ of the prosecutors, obtained the key of the storehouse from E, and was allowed to remove a quantity of the wheat, upon his representation to E, that he had been sent by C, and was to take the wheat to the Brighton railway station. This representation was false, and he subsequently disposed of the wheat. Held to be larceny of the wheat.

So, obtaining money by the practice of ring dropping, (as it is called,) has been held to be larceny: Rex v. Patch, 1 Leach C. C. 238. So where the prosecutor was induced by a preconcerted plan, to deposit his money with one of the defendants, as a deposit upon a pretended bet, and the stockholder afterwards, upon pretence that one of his confederates had won the wager, handed the money over to him; and it was left to the jury to say whether at the time the money was taken, there was not a plan that it should be kept, under the false color of winning the bet, and the jury found that there was; this was held to be larceny: Rex v. Robson, Russel & Ryan, C. C., 413. In like manner, the obtaining of goods under cover of legal process, may amount to larceny. As if a man, animo furandi, sue out a replevin, and by that means obtains the possession of another man's horse, and rides away with it; or by a fraudulent

ejectment get possession of another's house, and carry away the goods out of it, he is guilty of larceny: 1 Hale, P. C., 507; 1 Hawkins, P. C., c. 33 § 12.

These and numerous other cases which might be cited illustrate the principle that the obtaining the possession of goods or property, animo furandi, by trick, fraud, or artifice, amounts to larceny. In this case it is claimed that there was no larceny because there was no felonious intent. It was the especial province of the jury to dispose of this question, and they have settled it against the defendant. It was fairly submitted to them as a question of fact, with the instruction substantially, that they must be satisfied from the evidence, beyond a reasonable doubt, that the defendant took the check feloniously, with intent to convert it to his own use, or that he obtained it by a trick or artifice, with a like felonious intent at the time he obtained it. Shall we say the jury were wrong, and reverse their finding? If there were no evidence of any felonious intent, or if the evidence greatly preponderated against such intent, we should feel bound to set aside this verdict. While we seek to administer the law impartially, we will not be astute in opening avenues of escape for criminals. We cannot say that there was not sufficient evidence of the felonious intent to sustain this verdict. For what purpose did the defendant get that check? He was upon the eve of failure. He had already hypothecated for his own debts the loan of the city placed in his hands for sale. He had unlawfully obtained $300,000 in cash as a loan, and it is reasonable to suppose that he could obtain nothing more from the city treasury by any ordinary means. Then it is that he goes there, and with a falsehood upon his lips obtains $33,000 more. The jury have found the intent with which this was done. We are not prepared to say they were wrong. In an ordinary case, the facts would have been too clear for doubt, and we will not hesitate here, because of the magnitude of the offence, or the standing of the offender. The justice which we administer to the humblest criminal, will be accorded to this defendant. Nothing more, nothing less.

The jury having found the animus furandi, and, in the opinion of the court, upon sufficient evidence, our judgment is, that the offence committed by the defendant in this case was larceny. . . . .

This case, as well as that of Commonwealth v. Marcer, has been twice argued upon this motion. The first time, the president judge and my brother PEIRCE, sat with me at my request, to aid me with their wisdom and experience. Impressed with the gravity of these cases, not only to the community, but to the defendants; in view of the fact that important principles of law were involved, which should be settled calmly and deliberately, we ordered a re-argument before a full bench. We have given a careful and anxious consideration to the law and the facts of the case, as well as to the able and exhaustive arguments of the learned counsel; and, while we are not unanimous in our conclusions, the majority of the court are so well settled in their convictions that we cannot hesitate as to our duty.

The verdict as to the second, third and fourth counts is set aside, and the rule for a new trial is refused.